**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY H. SZOSTEK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **DREXEL UNIVERSITY,** | : | **NO. 12-2921** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

**Tucker, C. J.**                                              **September ___, 2013**

Presently before the Court is Defendant's Motion for Summary Judgment (Docs. 14 & 18), Plaintiff's Response in Opposition (Doc. 15), Plaintiff's Reply (Doc. 20), and Defendant's Sur-Reply (Doc. 23).  Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Defendant's motion will be ***granted***.

**I.        FACTUAL BACKGROUND**

In 1997, Plaintiff Anthony Szostek ("Plaintiff") was hired by Defendant Drexel University ("Drexel") as a custodian.  Later, in 2003, Plaintiff was promoted to the position of groundsman.  Subsequently, on September 23, 2007, Plaintiff was promoted to the position of Commercial Driver through Drexel's bidding process.  Plaintiff held the position of Commercial Driver at the time he was terminated on January 5, 2011.  As a Commercial Driver, Plaintiff's primary duties included routinely operating student passenger buses of approximately forty-eight students and operating recycling trucks.  Sharukh Nayar ("Mr. Nayar"), Supervisor of Transportation, supervised Plaintiff in the position of Commercial Driver.  Francis Maahs ("Mr.

1

Maahs"), Assistant Director of Transportation, supervised Mr. Nayar. Michael Smith ("Mr. Smith"), Director of Facilities Management, supervised Mr. Maahs.

During his employment, Plaintiff was a member of Teamsters Local 115. Consequently, Plaintiff was subject to the Collective Bargaining Agreement between Teamsters Union Local 115 Custodial Employees and Drexel University ("CBA"). Pursuant to the CBA, Plaintiff would receive the following types of paid leave per year: two (2) personal days; eleven (11) sick days; and 13.33 hours (1 2/3 days) of vacation which would accrue on a monthly basis. Although the CBA allows unused sick and vacation leave to be carried into the following year, Plaintiff exhausted all of his paid sick and vacation leave for 2009. Accordingly, Plaintiff did not carry over any time from 2009 into 2010.[1]

In addition, Drexel's Family and Medical Leave Policy ("FMLA Policy") states, in relevant part:

> When an employee takes FMLA leave because of the employee's own serious medical condition, the employee is required to use all of their available paid time during the FMLA leave. The employee will be required to exhaust all available sick time (if applicable) and vacation time at the beginning of the leave. . . . Should the employee exhaust his/her accrued sick and/or vacation time, the remainder of the leave, if any, will be unpaid.
>
> […]
>
> FMLA benefits run concurrently with benefits provided by Workers' Compensation.

Further, Drexel's Workers' Compensation Policy states, in pertinent part:

> Any lost time as a result of a work-related injury or accident that also qualifies as a medical leave of absence will be charged against an eligible employee's Family and Medical Leave.

---

[1] Specifically, as of November 17, 2009, Plaintiff exhausted all of his paid sick time for 2009. (Jones Decl. at ¶ 2.) As of December 29, 2009, Plaintiff exhausted all of his paid vacation time for 2009. (Jones Decl. at ¶ 2.)

Accordingly, pursuant to Drexel's policies, an employee is entitled to twelve weeks (60 days) of intermittent FMLA leave, which would run concurrently with any sick, vacation and/or workers' compensation leave.  In 2000, Plaintiff received a copy of Drexel's FMLA Policy, which explained the substitution of paid leave and workers' compensation leave for FMLA leave.  Plaintiff admits receiving this letter.

Prior to the events of this case, Plaintiff had taken both FMLA leave and workers' compensation leave through Drexel.  Specifically, Plaintiff took intermittent FMLA leave through Drexel in 2002 and 2006 with regard to the births of two of his children.  Each of these intermittent leaves lasted for one year.  Plaintiff also took workers' compensation leave though Drexel in 2006.  Plaintiff was again mailed a copy of Drexel's FMLA Policy via letter dated January 18, 2006.  Plaintiff denies receiving this letter.  On or around August 25, 2006, Plaintiff was also mailed a letter regarding his 2006 workers' compensation leave running concurrent with his 2006 FMLA leave. Plaintiff also denies receiving this letter.

In November 2009, Plaintiff was diagnosed with depression and anxiety.  On February 4, 2010, as a result of these conditions, Plaintiff again applied for intermittent FMLA leave through Drexel's Human Resources Department.  Keyanah Jones ("Ms. Jones") was the Human Resources representative responsible for processing Plaintiff's FMLA leave request.  In response to Plaintiff's request for FMLA leave, Drexel Human Resources provided Plaintiff with a "Bargaining Unit Employees Family or Medical Leave Request" form ("FMLA Request Form"), which Plaintiff completed and submitted to Ms. Jones on February 4, 2010.  Drexel's FMLA Request Form notified Plaintiff that he was eligible for a total of twelve weeks (60 days) of unpaid FMLA leave.

In addition to the FMLA Request Form, on February 5, 2010, Plaintiff submitted to Drexel a "Certification of Health Care Provider for Employee's Serious Health Condition" ("Medical Certification"). The Medical Certification was completed by Plaintiff's treating physician, Dr. Heather Hart ("Dr. Hart"). According to the Medical Certification, Plaintiff's depression and anxiety symptoms included: anhedonia, inability to motivate and focus, low energy, and poor sleep habits. Plaintiff's Medical Certification further stated that Plaintiff was "unable to focus and perform essential duties of his job during 'flare-ups'" of his disability. Plaintiff's Medical Certification estimated that Plaintiff would have approximately ten "flare-ups" per month over the subsequent six months. Plaintiff's Medical Certification estimated that each "flare-up" would last approximately two days.

On February 15, 2010, Plaintiff was approved for intermittent FMLA leave as of February 5, 2010. Plaintiff was notified of his approval for FMLA leave via Drexel's "Employer Approval for Employee Request for Medical Leave" form ("Employer Approval Form"), which was mailed to Plaintiff.[2] The Employer Approval Form again indicated that Plaintiff had a right to twelve weeks (60 days) of FMLA leave. At the time of Plaintiff's 2010 FMLA request, it was the policy and practice of Drexel to approve intermittent FMLA leave on a six-month basis. As such, and as indicated on the Employer Approval Form, Plaintiff's approved period of FMLA leave was from February 5, 2010 to August 4, 2010. If an employee did not exhaust his intermittent FMLA leave during this initial six month period Drexel, consistent with FMLA

_____

[2] Technically speaking, two separate Employer Approval Forms were sent to Plaintiff. These forms were dated February 15, 2010 and May 21, 2010, respectively. Plaintiff testified that there was a discrepancy between his doctor's Medical Certification and Drexel's February 15, 2010 Employer Approval Form. Specifically, Plaintiff testified that the February 15, 2010 Employer Approval Form indicated that he could take up to two days of leave per month; however, the Medical Certification indicated that "flare-ups" could occur up to ten times per month. Although Plaintiff denies receiving a copy of Drexel's February 15, 2010 Employer Approval Form, Plaintiff admitted that he asked Drexel to adjust the form so that it was consistent with his Medical Certification. Consequently, on May 21, 2010, Drexel issued a revised Employer Approval Form which did not set a limitation on Plaintiff's absences per month.

regulations, would require the employee to recertify his medical leave at the conclusion of the six months.

Despite these facts, Plaintiff testified that because he did not have a valid mailing address,[3] he did not receive the Employer Approval Form stating that his leave period was from February 5, 2010 to August 4, 2010. Rather, Plaintiff testified that he understood, from his prior experiences taking FMLA leave, that his intermittent leave would be for a period of one year. Plaintiff further testified that his immediate supervisor, Mr. Nayar, informed him that he would receive FMLA leave intermittently for one year.

In addition, prior to the conclusion of his intermittent FMLA leave, Plaintiff began workers' compensation leave due to a work-related injury (cracked ribs). Plaintiff was on workers' compensation leave from July 12, 2010 to August 26, 2010. Prior to 2010, Plaintiff had taken workers' compensation leave several times during his employment at Drexel, including the aforementioned workers' compensation leave Plaintiff took in 2006.

In 2010, upon Plaintiff's return from workers' compensation leave, he was absent from or late to work on the following dates: August 27, 30 and 31; September 3, 7, 10, 16 (43 minutes late), 21, 22, 30; and October 1 (1.26 hours late), 4, 5, and 8, 2010. Consistent with Drexel's FMLA Policy, Plaintiff's paid sick and vacation time and workers' compensation leave ran concurrent with his unpaid FMLA leave and thus were counted against his FMLA leave entitlement. The codes on Plaintiff's payroll records indicate which paid leave Plaintiff received

---

[3] Plaintiff states that in February 2010, he was living in a trailer on land he owns on Old Plains Road in Pennsburg, PA. This location did not have a mailing address. The outdated address Plaintiff provided on his FMLA Request Form was his previous address, located on Buttonwood Street in Perkasie, PA. Plaintiff claims that he indicated his old Perkasie address on the FMLA Request Form because that was the only mailing address he had. Plaintiff further testified that he informed Mr. Nayar that he did not have a direct mailing address and asked that he be able to receive correspondence and communications through his supervisors. According to Plaintiff, Ms. Jones indicated that she was "okay" communicating through Plaintiff's supervisors.

for any particular absence. Thus, according to Drexel's records, by approximately September 7, 2010, Plaintiff had exhausted all of his intermittent FMLA leave. Consequently, Drexel did not request FMLA recertification from Plaintiff upon his return from workers' compensation leave as he had exhausted all of his twelve weeks (60 days) of FMLA leave entitlement.

Further complicating matters, effective August 1, 2010 — while Plaintiff was on workers' compensation leave — Drexel began outsourcing the management of its FMLA program to a third party administrator, The Hartford. The Hartford had the sole discretion to approve or deny a Drexel employee's FMLA leave request. Further, because The Hartford was responsible for the administration of Drexel's FMLA leave, an employee requesting FMLA leave was required to contact The Hartford to apply for FMLA. Once an application for FMLA leave was approved, the employee was required to contact The Hartford to report each FMLA absence. Thus, after August 1, 2010, an employee on approved FMLA leave was required to report each FMLA absence to both Drexel and The Hartford.

In July 2010, Drexel sent its employees, including Plaintiff, information in the mail regarding this change in FMLA procedure. However, Plaintiff again claims that he did not receive the mailing regarding the change in FMLA procedure because he did not have a valid mailing address during this time period.[4] In any event, Plaintiff attended a Commercial Drivers meeting at Drexel on October 28, 2010, where he was informed of the change in FMLA notification procedure. Specifically, at this meeting, Plaintiff received information regarding The Hartford's administration of Drexel's FMLA leave as well as a directive to call The Hartford if he required FMLA leave. Plaintiff concedes he heard this information. Further, during this

---

[4] Plaintiff chose not to complete an updated change of address form when he moved from the Buttonwood Street address to the lot on Old Plains Road. Drexel notes, however, that Plaintiff managed to provide a valid address (his sister's) to the workers' compensation carrier in July 2010 so that he could receive his workers' compensation checks in the mail.

meeting, Mr. Maahs provided a brochure from The Hartford explaining the change in the FMLA procedure to the attendees of the meeting. Plaintiff denies he received a copy of The Hartford brochure at this meeting.

As previously stated, Drexel maintains that Plaintiff had exhausted his intermittent FMLA leave by September 7, 2010.  Nonetheless, Drexel did not count Plaintiff's approximately eight days of unapproved absences between September 7, 2010 and October 8, 2010 against him during its progressive discipline process.  Rather, Drexel began its progressive discipline of Plaintiff's unapproved absences beginning with Plaintiff's absences on October 21, 25-27, 29, 2010 and November 2 and 3, 2010.  At some point, Plaintiff's supervisor, Mr. Nayar, noticed that Plaintiff was calling out from work under purported FMLA leave.  Specifically, Plaintiff would call Drexel's call-out line and report that he was going to be absent due to approved FMLA leave.  Mr. Nayar confirmed with Drexel's Human Resources Department that Plaintiff had exhausted his FMLA leave entitlement.  Thus, Drexel argues, Plaintiff's claim of FMLA leave was false.

Subsequently, on November 4, 2010, Plaintiff had a meeting with Mr. Nayar and Kevin Flemming, his union steward, regarding Plaintiff's stated reason for calling out of work on October 21, 25-27, 29, 2010 and November 2 and 3, 2010.  At this meeting, Mr. Nayar informed Plaintiff that he was not on approved FMLA leave.  Plaintiff asserts this was the first time he was informed that his FMLA leave had ended.  Plaintiff maintains that he believed he was on FMLA leave for a year (until February 5, 2011), and therefore did not reapply for FMLA leave in September, October, and November 2010 because he did not know there was a reason to.  Also

on November 4, 2010, Plaintiff met with Mr. Maahs, who directed him to contact The Hartford if he needed FMLA leave and to try to get his previous absences backdated.[5]

The same day, after these meetings, Plaintiff contacted The Hartford. During this November 4, 2010 call, which was recorded, The Hartford expressly instructed Plaintiff to call The Hartford to report any absences related to his FMLA request. The Hartford further informed Plaintiff that a failure to call could result in the denial of FMLA coverage due to late reporting. Significantly, Plaintiff was also asked during this call whether there was any time he previously missed that needed to be reported. However, Plaintiff neglected to report any of his earlier absences. Further, by letter dated November 9, 2010, The Hartford informed Plaintiff a second time that he needed to call The Hartford to report any absences related to his FMLA request or he could be denied FMLA coverage for late reporting.

According to Drexel's records, Plaintiff was absent from work again on November 10, 11, 23 and 24, 2010 and did not call The Hartford to report these absences. Plaintiff *did* notify Drexel of his absences on these dates, but claims he was unaware that he also had to call The Hartford to report absences. Plaintiff asserts it was not until November 30, 2010 that he was informed, by a co-worker, that he needed to notify The Hartford when he took FMLA leave. Plaintiff began reporting his absences to The Hartford as of November 30, 2010.

Subsequently, by letter dated December 6, 2010, The Hartford informed Plaintiff that he was not eligible for FMLA for certain dates — October 21, 25-27, 29, 2010 and November 2, 3, 10, 11, 23 and 24, 2010 — due to his failure to notify The Hartford of FMLA leave within the time frame required as part of the approval process. The Hartford notified Drexel of its decision to deny Plaintiff FMLA leave for these dates. By separate letter, also dated December 6, 2010,

---

[5] Plaintiff further testified Mr. Maahs, on several occasions, encouraged him to contact The Hartford to get his absences covered under FMLA.

The Hartford informed Plaintiff that he was approved for FMLA leave beginning November 30, 2010 because Plaintiff timely notified The Hartford of his need for leave as of this date.[6]

On approximately December 16, 2010, Mr. Smith and Mr. Maahs contacted The Hartford to confirm that The Hartford did in fact deny the aforementioned dates as FMLA leave. The Hartford confirmed that these dates were not approved for FMLA leave. Consequently, Plaintiff's unapproved absences for October 21, 25-27, 29, 2010 and November 2, 3, 10-11, and 23-24, 2010 were counted as "Leave Without [sic] Pay." Under the CBA, Leave Without Pay occurrences are calculated by grouping consecutive absences.[7] Thus, Plaintiff's unapproved absences placed him in the disciplinary process as outlined below:

- October 21, 2010 – First occurrence of Leave Without Pay
- October 25, 26, and 27, 2010 – Second occurrence of Leave Without Pay
- October 29, 2010 – Verbal Warning
- November 2 and 3, 2010 – Written Warning
- November 10 and 11, 2010 – Suspension 1-day
- November 23 and 24, 2010 – Termination

Further, Plaintiff had no available paid time off ("PTO") to cover his unapproved absences. As such, Plaintiff had no available leave to cover his unapproved absences on October 21, 25-27, 29, 2010 and November 2, 3, 10-11, and 23-24, 2010. Mr. Smith and Mr. Maahs then made the decision to terminate Plaintiff's employment for (1) violation of CBA Article 14 (1)(C) through "proven dishonesty" — *i.e.*, Plaintiff allegedly providing false information to his

---

[6] The Hartford uses a rolling calendar year to determine employee eligibility for FMLA leave, such that Plaintiff would receive a new cycle of twelve weeks of FMLA leave once The Hartford approved the FMLA leave. In other words, despite the fact that Plaintiff exhausted his FMLA leave through Drexel in September 2010, The Hartford did not count that against Plaintiff's FMLA leave entitlement in November 2010; rather, The Hartford gave Plaintiff a full twelve weeks of FMLA leave beginning with November 30, 2010, which could have been taken until November 2011.

[7] For example, if an employee is absent on a Monday, returns to work on Tuesday and then is absent again on Thursday and Friday, the employee would have two Leave Without Pay occurrences: one occurrence for Monday and one occurrence for Thursday and Friday.

supervisor about being on approved FMLA leave, and (2) violation of the Leave Without Pay Policy as outlined above. Pursuant to the CBA, making false statements alone would be sufficient for immediate termination.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed R. Civ P. 56(a); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248; Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986). Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.

See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III.     DISCUSSION

Plaintiff now brings the following claims against Drexel: (1) retaliation and interference[8] in violation of the Family and Medical Leave Act ("FMLA") (Counts I and III); (2) discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") (Counts II and III); (3) workers' compensation retaliation (Count III); and (4) discrimination and retaliation in violation of the Pennsylvania Human Relations Act ("PHRA") (Count IV).  Drexel argues that it is entitled to summary judgment on all these claims because Plaintiff cannot establish the essential elements of his claims.  The Court will examine each of Plaintiff's claims in turn.

**A.  Violation of the Family Medical Leave Act (Counts I and III)**

The FMLA grants eligible employees the right to take up to twelve workweeks (60 days) of leave in any twelve-month period if a "serious health condition ... makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The

---

[8] It is not clear to the Court that Plaintiff has properly pleaded a claim of interference with his FMLA rights. By the Court's estimation, the Count I of the Complaint only pleads retaliation in violation of the FMLA, and is therefore repetitive of Count III.  However, the Court will nonetheless address Plaintiff's interference claim because: (1) Drexel addresses the substance of Plaintiff's FMLA interference arguments (Def.'s Rep. Supp. Summ. J. 25-29) and does not argue that inference has not been properly pleaded, (2) there is some factual and analytical overlap between Plaintiff's FMLA retaliation and interference claims, and (3) the Court finds that Plaintiff's interference claims, even if properly pleaded, fail in any event.

FMLA allows an employer to require recertification of intermittent FMLA leave at the conclusion of six months. 29 C.F.R. § 825.308 (b). Even when qualifying circumstances exist, an employee cannot invoke rights under the FMLA if they fail to provide adequate notice of their need for leave. 29 U.S.C. § 2612(e). When the need for leave is unforeseeable, employees are obligated to notify their employer "as soon as practicable," 29 C.F.R. § 825.303(a), and "provide sufficient information for an employer to reasonably determine whether the FMLA may apply." 29 C.F.R. § 825.303(b).

When employees invoke rights protected by the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1). Employers also cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to as 'interference' whereas the latter is often referred to as 'retaliation.'" Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.2005)).

    1.  Retaliation

To prove an FMLA retaliation claim, Plaintiff must show that: (1) he invoked his right to FMLA benefits; (2) he suffered an adverse employment decision; and (3) the adverse decision was causally related to the invocation of his rights. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). Courts analyze FMLA retaliation claims based on circumstantial evidence under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this scheme: (1) the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action;

and (3) if defendant meets its burden of production, the plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802.

a. <u>Prima Facie Case</u>

There is no dispute that Plaintiff has established the first two elements of a *prima facie* case of FMLA retaliation. Drexel argues, however, that Plaintiff cannot establish the third element because he cannot show that his termination was causally related to his invocation of FMLA rights; rather, Drexel maintains that it discharged Plaintiff because of his proven dishonesty under the CBA and his violation of Drexel's Leave Without Pay Policy. Plaintiff argues that causation is a question for the jury.

The Court finds that Plaintiff has not placed enough evidence into the record to create a genuine issue of material fact as to whether there was a causal link between his FMLA leave and his termination. Courts consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 284 (3d Cir.2000). For instance, "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' [this] is sufficient standing alone to create an inference of causality and defeat summary judgment." <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007) (citing <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268 (2001) and <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir.1989)). In the instant matter, however, the Court does not find temporal proximity alone to be sufficient. Plaintiff was approved for his third FMLA leave at Drexel on February 5, 2010; approximately eleven months later, on January 5, 2011, he was terminated. The Court does not find this eleven month period between Plaintiff's approval for FMLA leave and his termination to be "usually

suggestive" of causation.  See Walsh v. Wal Mart Stores, Inc., 200 F. App'x 134, 135 (3d Cir. 2006) (eight months too long for temporal proximity to be unusually suggestive); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997) (nineteen months too long for temporal proximity to be unusually suggestive); King v. School Dist. of Philadelphia, No. 00–2503, 2001 WL 856948, at *4–5 (E.D.Pa. July 26, 2001) (ten months too long for temporal proximity to be unusually suggestive).  Likewise, the Court does not find the nearly two months that elapsed between Plaintiff's November 4, 2010 request for FMLA leave through The Hartford and his February 5, 2010 termination to be unusually suggestive of retaliation. See Merit v. Se. Pennsylvania Transit Auth., 315 F. Supp. 2d 689, 707 (E.D. Pa. 2004) aff'd sub nom. Merit v. Se. Pa. Transit Auth., 122 F. App'x 598 (3d Cir. 2005) (holding a period of at least several weeks is not unusually suggestive of retaliatory motives).

Where the temporal proximity is not "unusually suggestive" of retaliation, courts may ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of retaliation.  LeBoon, 503 F.3d at 232 (citing Farrell, 206 F.3d at 280).  "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Id. at 232-33 (citing Farrell, 206 F.3d at 279-81).  In the instant matter, at various points in his briefs, Plaintiff appears to allege that he was treated less favorably than other similarly situated employees.  The Court will construe these allegations as Plaintiff's proffer of circumstantial evidence of retaliatory animus toward him, and accordingly address these arguments.

First, Plaintiff testified that two other employees, Efraim Lugo and Vincent Brancato, also took FMLA leave and neglected to call The Hartford but, unlike Plaintiff, were not

terminated. (See Szostek Dep. 216:16-220:21.) However, Plaintiff fails to present any evidence regarding similar conduct on the part of Mr. Lugo or Mr. Brancato that would result in progressive discipline similar to that imposed on Plaintiff. Thus, Plaintiff's speculation that Mr. Lugo and Mr. Brancato failed to call The Hartford is insufficient without corroborating evidence. Second, with respect to Drexel's decision to terminate Plaintiff's employment for proven dishonesty, Plaintiff asserts that Mr. Brancato, John McBride, and Chris Kerns engaged in proven dishonesty, but were not terminated from their employment with Drexel. (See Pl.'s Resp. Opp'n Mot. Summ. J. 21.) Again, however, Plaintiff fails to come forward with any evidence regarding similar conduct on the part of Mr. Brancato, Mr. McBride, or Mr. Kerns that would warrant discipline similar to Plaintiff.[9] Thus, the Court finds Plaintiff's unsupported allegations of disparate treatment do not give rise to an inference of retaliation.

Likewise, the Court finds nothing else in the record which would support the inference that Plaintiff was discharged because he took FMLA leave. As an initial matter, the Court notes that Mr. Smith and Mr. Maahs, the Drexel employees responsible for the decision to end Plaintiff's employment, were not in any way involved in the review of Plaintiff's request for FMLA leave. The only information Mr. Smith and Mr. Maahs reviewed from The Hartford was The Hartford's decision to deny Plaintiff's October 21, 25-27, 29, 2010 and November 2, 3, 10, 11, 23 and 24, 2010 absences as FMLA leave. Thus, there is no evidence that any of the Drexel employees who reviewed Plaintiff's absences had any information regarding his underlying request for FMLA leave. Further, Plaintiff has pointed to no evidence in the record connecting his request for leave with his termination. The evidence reveals that Drexel did not discharge

---

[9] Drexel notes Plaintiff was terminated for both violations of the Leave Without Pay Policy and proven dishonesty under the CBA. Drexel argues that Plaintiff fails to come forward with any evidence that any of these three individuals violated the Leave Without Pay Policy *and* engaged in proven dishonesty.

Plaintiff until nearly two months after he reapplied for FMLA leave through The Hartford. Even then, Drexel only terminated Plaintiff after The Hartford determined that these absences would not be FMLA-approved.

Moreover, Plaintiff testified that no Drexel employee made any negative comments to him regarding his pending request for FMLA leave. (Szostek Dep. 213:2-5.) To the contrary, Mr. Maahs encouraged Plaintiff to reapply for FMLA leave through The Hartford and "continuously" urged Plaintiff to try to get his previous unapproved absences backdated by The Hartford. (Szostek Dep. 146:14-21.)

Thus, given the lack of causal connection between Plaintiff's request for FMLA leave and Plaintiff's termination, the Court finds Plaintiff has not established a *prima facie* case of retaliation under the FMLA.

### b. Pretext

Even assuming Plaintiff could make out a *prima facie* case of FMLA retaliation, he would still have to establish that Drexel's legitimate, non-discriminatory reasons for termination are pretextual. As the Third Circuit has explained:

> [T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations omitted). Further, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons…was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (internal citations omitted)

(emphasis in original). However, in rebutting the employer's proffered reason, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765 (internal citations omitted). Rather, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence… and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. (internal quotations omitted) (emphasis in original).

In the instant matter, as previously stated, Drexel has cited two reasons for Plaintiff's termination: (1) proven dishonesty; and (2) violation of Drexel's Leave Without Pay Policy. All of the individuals involved in the decision to terminate Plaintiff's employment testified consistently regarding the reasons for Plaintiff's termination. (See Smith Dep. 31:1-11, 37:8-38:23; Nayar Dep. 77:5-78:14; Maahs Dep. 12:20-13:2, 28:19-25; see also Def.'s Ex. 24, "Plaintiff's Termination Letter.") With respect to proven dishonesty, Drexel argues that after Plaintiff exhausted his twelve weeks (60 days) of intermittent FMLA leave, he continued to be absent from work. According to Drexel, Plaintiff engaged in proven dishonesty by misleading his supervisors to believe that he was on FMLA leave by calling out and reporting FMLA as the reason for his absences even though he exhausted his FMLA leave. In response, Plaintiff contends that Drexel's assertion that he was dishonest is "absolutely false" because he "did not make any misrepresentations about being on FMLA in September and October of 2010." (Pl.'s Resp. Opp'n Mot. Summ. J. 27.) Plaintiff then goes on to argue that he "believed that his intermittent FMLA leave that began in February of 2010 lasted for one year." (Id.)

The Court finds Plaintiff's arguments unavailing. Plaintiff's arguments amount to little more than rationalizations, and rationalizations are not evidence. The simple fact is that Plaintiff's explanation for why he believed he was still on FMLA leave (and therefore was not intentionally dishonest) does nothing to overcome the fact that Plaintiff's representations on October 21, 25-27, 29, 2010 and November 2 and 3, 2010 that he was still on approved FMLA leave were in fact "dishonest" *if* Plaintiff no longer had any available leave to excuse these absences. Plaintiff does not convincingly argue that Drexel's calculation of his leave expenditure was in some way incorrect.[10] More importantly, Plaintiff has presented no competent record evidence which suggests he had not exhausted his available FMLA leave by

---

[10] In an attempt to salvage his FMLA retaliation claim, Plaintiff advances a number of arguments as why his FMLA leave was not exhausted by September 7, 2010. (See footnote 11, *infra*.) Toward that end, Plaintiff argues his leave was not exhausted because Drexel miscalculated his FMLA expenditure by concurrently counting the workers' compensation leave he took from July 12, 2010 to August 26, 2010. It is Plaintiff's position that these thirty-four days of workers' compensation leave should not have been counted against his FMLA leave.

However, Plaintiff ignores the fact that the FMLA regulations allow employers to do just that. Workers' compensation leave may be counted against the employee's FMLA entitlement so long as the work-related injury is also a serious health condition and the employer provides proper notice that the FMLA leave and workers' compensation leave will run concurrently. See 29 C.F.R. § 825.207(e) ("The Act provides that a serious health condition may result from injury to the employee on or off the job. If the employer designates the leave as FMLA leave in accordance with § 825.300(d), the leave counts against the employee's FMLA leave entitlement."); see also 29 C.F.R. § 825.702(d)(2) ("An employee may be on a workers' compensation absence due to an on-the-job injury or illness *which also qualifies as a serious health condition under FMLA*. The workers' compensation absence and FMLA leave may run concurrently (*subject to proper notice and designation by the employer*") (emphasis added); Dotson v. BRP U.S. Inc., 520 F.3d 703, 708-09 (7th Cir. 2008) ("A number of other regulations address questions that arise when FMLA and workers' compensation run concurrently, further evidencing the lawfulness of this practice. See §§ 825.210(f), 825.220(d), 825.307(a)(1), 825.702(d)(1). All of these regulations make clear that if the employer provides adequate notice, FMLA may run concurrently with workers' compensation benefits."); Rodriguez v. Atria Sr. Living Grp., Inc., 887 F. Supp. 2d 503, 517-18 (S.D.N.Y. 2012); Provence v. Avon Grove Charter Sch., CIV. A. 07-659, 2008 WL 2928314 (E.D. Pa. July 28, 2008).

Plaintiff does not argue that his work related injury would not have qualified as a serious health condition as defined by the applicable regulations. See 29 C.F.R. § 825.113. In addition, Plaintiff cannot argue he did not have notice that his FMLA and workers' compensation leaves could run concurrently. Drexel's policy regarding the substitution of paid leave and workers' compensation leave for FMLA leave is clearly delineated in both Drexel's FMLA and workers' compensation policies. Further, Drexel consistently enforces this policy, as demonstrated by Drexel's previous substitution of Plaintiff's 2006 workers' compensation leave for Plaintiff's 2006 intermittent FMLA leave. (See Def.'s Ex. 28, "August 25, 2006 Letter to Plaintiff.")

September 7, 2010.[11]  And in light of the fact that, based on the record evidence, Plaintiff had no

available leave, Plaintiff's representations that he still had FMLA leave available were false.

---

[11] In his reply brief, Plaintiff raises a number of arguments as to why he did not exhaust his 60 days of FMLA leave. (See Pl.'s Reply 1-3.)  First, Plaintiff cites the testimony of Ms. Jones as proof that his workers' compensation leave did not run concurrently with his FMLA leave from July 12, 2010 to August 26, 2010, and therefore he had not exhausted his FMLA leave by September 7, 2010.  Under Plaintiff's logic, this would mean that he still had FMLA leave available and therefore was not dishonest.  However, Ms. Jones testimony does not support this proposition.  Ms. Jones testified as follows:

> Q: Would you agree that for the year 2010 Mr. Szostek did not — whether approved or unapproved FMLA did not use up more than 60 days of FMLA?
>
> A: *I can't say for sure.  Based on the dates I recall* he probably did not.

(Jones Dep. 75:17-25) (emphasis added).  Ms. Jones testimony suggests nothing more than that, at the time of her deposition, she could not say for sure if Plaintiff exhausted his leave because she could only recall certain dates during her deposition.  Her testimony does not, as Plaintiff argues, create a genuine issue of material fact as to whether Plaintiff had exhausted his FMLA leave.  Further, in both her deposition and in her declaration, Ms. Jones consistently stated that there was no concern regarding the overlap of Plaintiff's FMLA and workers' compensation leave in the summer of 2010. (Jones Dep. 67:18-25 and Jones Decl. at ¶ 12.)

Next, Plaintiff cites an email from Mr. Nayar to Ms. Jones as proof that he did not exhaust his FMLA leave.  On November 10, 2010 Ms. Jones sent an email asking Mr. Nayar to "[p]lease provide the hours used during [Plaintiff's] previous intermittent leave February 5, 2010 through August 4, 2010." (Pl.'s Reply Ex. B.)  In his email response, Mr. Nayar listed the twenty-one dates Plaintiff called out as *unpaid* FMLA as they were recorded in the payroll system. (Nayar Dep. 39:2-40:6, 90:20-91:5.)  Plaintiff notes that Mr. Nayar did not count the dates Plaintiff was on workers' compensation leave.  Thus, Plaintiff argues, Drexel should not have concurrently counted Plaintiff's FMLA and workers' compensation leaves.  Under Plaintiff's logic, this would again mean that his workers' compensation leave did not run concurrently with his FMLA leave, and therefore he had not exhausted his FMLA leave by September 7, 2010.

Mr. Nayar testified, however, that he relied on the Payroll Detail Report in drafting his response to this email. (Nayar Dep. 48:4-7.)  A review of the Payroll Detail Report confirms that Mr. Nayar only listed Plaintiff's unpaid FMLA dates in his email to Ms. Jones. (Jones Decl. at ¶ 14 and Ex. A to Jones Decl.)  Further, when questioned about this email in his deposition, Mr. Nayar testified: "I cannot say what she has requested.  There might be more." (Nayar Dep. 68:10-15.)  Based on the foregoing, it is evident that Mr. Nayar's email does not include Plaintiff's sick, vacation, and workers' compensation time that were counted against Plaintiff's FMLA entitlement.  Therefore, Mr. Nayar's email is at best incomplete because it only lists the days Plaintiff was coded as being on unpaid FMLA.  As such, Mr. Nayar's email cannot be seen as a definitive calculation of Plaintiff's FMLA usage for 2010.  Again, Mr. Nayar's testimony does not, as Plaintiff argues, create a genuine issue of material fact as to whether Plaintiff had exhausted his FMLA leave.

Plaintiff then argues that he did not exhaust his FMLA leave because, if he had, he would not have been able to reapply for FMLA leave on November 4, 2010.  The problem, however, is that this argument ignores the fact that Plaintiff was only able to reapply for FMLA leave because The Hartford had taken over administration of Drexel's FMLA policy on August 1, 2010 and The Hartford operates on a rolling calendar (See footnote 6, *supra*.) Drexel has conceded that "had Drexel not outsourced its FMLA leave administration to The Hartford, Plaintiff would not have been eligible to apply for FMLA leave through Drexel until February 5, 2011." (Def.'s Rep. Supp. Summ. J. 11.)  Thus, contrary to Plaintiff's assertions, Plaintiff was in fact able to get *more* FMLA leave in 2010 than he was otherwise entitled to because The Hartford came into the picture.

Further, Plaintiff does not debate that under the CBA proven dishonesty, standing alone, is grounds for termination. (Szostek Dep. 178:2-20.)

It does appear that Plaintiff was earnestly mistaken in his belief that he still had available leave to cover these absences. The Court would note, however, that there was no shortage of opportunities in this case for Plaintiff to have been better informed about the amount of leave he had available. For example, had Plaintiff provided a valid mailing address on his February 2010 FMLA application form, he would have received the Employer Approval Forms which were mailed to him — both of which clearly state that Plaintiff was on approved leave from February 5, 2010 to August 4, 2010. As such, Plaintiff would have known he needed to reapply for FMLA leave after August 4, 2010.[12] See Lipscomb v. Elec. Data Sys. Corp., 462 F. Supp. 2d 581, 589 (D. Del. 2006) aff'd, 275 F. App'x 144 (3d Cir. 2008) (holding proper notice of FMLA letters can be inferred because addressor correctly addressed copy of letter to the plaintiff, and that the plaintiff's "conclusory and unsupported assertion…that she did not receive the letters [did] not create a genuine issue of material fact.")

Further, Plaintiff had taken intermittent FMLA leave from Drexel on two prior occasions, and therefore arguably should have been familiar with how Drexel's FMLA Policy works. Plaintiff has testified that when he previously took intermittent FMLA leave in 2002 and 2006, he was approved for an entire year. Plaintiff asserts that, based on his prior experiences, he did not know that in 2010 he needed to recertify for FMLA leave after only six months. This is immaterial. Regardless of whether Plaintiff's FMLA leave was approved on an annual or six-month basis, Plaintiff was well-aware that the maximum FMLA leave entitlement is twelve weeks. Plaintiff, as the individual approved for intermittent FMLA leave, is the only person with

---

[12] As previously stated, Drexel did not count Plaintiff's absences from August 27, 2010 to September 7, 2010 as part of its progressive discipline process. During these dates, Plaintiff would have had leave available had he re-certified after August 4, 2010.

any control over how quickly those twelve weeks of approved FMLA are depleted.  In particular,

Plaintiff cannot claim ignorance of the fact that he could exhaust intermittent FMLA leave prior

to the expiration of a year, because he had in fact exhausted his previous 2006 intermittent

FMLA leave in less than one year. Specifically, Plaintiff exhausted his 2006 intermittent FMLA

leave within six months in June 2006. (See Def's Ex. 26, "September 12, 2006 Letter to

Plaintiff.")

Lastly, Drexel's second reason for terminating Plaintiff was Plaintiff's violation of

Drexel's Leave Without Pay policy through his unapproved absences on October 21, 25-27, 29,

2010 and November 2, 3, 10-11, 23-24, 2010.  Plaintiff argues that this reason for his termination

is pretextual because, rather than disciplining him at the time of each of these infractions, Drexel

instead "held discipline in abeyance" (*i.e.*, accumulating all the infractions and then taking

disciplinary action).  Plaintiff contends that, had he been given timely notice of these infractions,

he would have been able to "correct his alleged errant ways." (Pl.'s Resp. Opp'n Mot. Summ. J.

28.)  Plaintiff suggests Drexel intentionally held discipline in abeyance in order to deprive him of

the opportunity to make this correction.

The Court also finds these arguments unpersuasive.  Importantly, Plaintiff does not deny

that he violated the Leave Without Pay Policy. (See Pl.'s Resp. Opp'n Mot. Summ. J. 8, 25, 26.)

Instead, Plaintiff merely argues that Drexel's decision to hold discipline in abeyance was unfair.

Again, though, rationalizations are not evidence and the fact that Drexel held Plaintiff's

discipline in abeyance is insufficient to show that Drexel's proffered justification for terminating

Plaintiff's employment was pretextual.  Plaintiff cites the testimony of Mr. Nayah and Mr.

Maahs for the proposition that holding discipline in abeyance was unusual.  However, Plaintiff

has cited no evidence which states it is impermissible under Drexel's policies to hold discipline

in abeyance.  Moreover, Plaintiff entirely ignores the fact that, by his own admission, Drexel

delayed taking any action on Plaintiff's unapproved absences in order to give Plaintiff the

opportunity to (1) properly apply for FMLA through The Hartford, and (2) attempt to have his

pre-FMLA approval absences backdated by The Hartford.[13]  Drexel delayed making any

decision regarding Plaintiff's discharge for nearly two months pending final confirmation from

The Hartford that his absences would not be FMLA-approved. Indeed, Mr. Smith waited to issue

Plaintiff's progressive discipline because, in the event, that The Hartford approved the dates as

FMLA, the absences would have been excused and Plaintiff would not have received progressive

discipline.

Ultimately, the reason Plaintiff violated the Leave Without Pay Policy is because his

absences on October 21, 25-27, 29, 2010 and November 2, 3, 10-11, 23-24, 2010 were not

approved by The Hartford as FMLA leave.  The reason these dates were not approved as FMLA

leave is because Plaintiff did not timely report these absences by requesting that the October 21,

25-27, 29, 2010 and November 2, 3, 2010 absences be backdated[14] and by calling The Hartford

directly to report the November 10, 11, 23 and 24, 2010 absences.  Plaintiff's failure to timely

report is undisputed and fully supported by the record evidence.

Plaintiff offers a number of reasons why his failure to call The Hartford to properly report

these absences should be excused, all of which are unpersuasive.[15]  But here again, there was no

---

[13] Specifically, Plaintiff testified at his deposition: "I was asked by Mr. Maahs to go back and try to get the dates backdated.  He continuously kept telling me to go call The Hartford and try to get the dates backdated so that would be covered." (Szostek Dep. 146:14-21).

[14] These are the absences that occurred before Plaintiff applied for FMLA through The Hartford on November 4, 2010.

[15] For example, Plaintiff suggests that the Court should disregard the clear instructions The Hartford provided to him during the November 4, 2010 call because, at the time of the call, he was in a noisy garage and had difficulty hearing. (Pl.'s Resp. Opp'n Mot. Summ. J. 9) (citing Szostek Deposition 163:12- 164:4.)

shortage of opportunities for Plaintiff to timely comply with the FMLA reporting policies, and

thereby avoid violating the Leave Without Pay Policy and being subject to discipline. When

Plaintiff eventually called The Hartford to apply for FMLA, The Hartford explicitly instructed

Plaintiff to call The Hartford to report any absences related to his FMLA request and informed

him that a failure to call could result in the denial of FMLA coverage for late reporting.[16]

Plaintiff was also asked during this call whether there was any time he previously missed that

needed to be reported.[17] Plaintiff answered in the negative, despite the fact that earlier that same

day Mr. Maahs (as Plaintiff has conceded) encouraged him to try to get his pre-November 4,

---

[16] Specifically, Plaintiff (the "Caller") had the following exchange with The Hartford representative:

> HARTFORD: "Okay. And now that we have your information, um, I'll go over the next few steps with you. We'll be mailing you a packet with a certificate of healthcare provider form to have your doctor to complete, um, we'll need that form back in 15 business days. It will probably be mailed out probably tomorrow so it means we would need that back by the 26th of November. If we get the form back and it's incomplete or insufficient, we'll return it back to you…and you would get an additional 10 business days to get that completed and returned….[I]f we for some reason need to verify the authenticity of the form, do we have your consent for our clinical team to reach out to your doctor?

> CALLER: Yes.

> HARTFORD: Okay. *And then the only other thing is, um, we need to verify and go over the reporting guidelines. If you ever have any kind of absence, if you have to be out for unforeseeable time, you need to make sure you report it to The Hartford on the date of the leave or the following business day so it won't be denied for late reporting.* Um, is there any other questions you might have for me at this time?

> CALLER: Now who do I call, what number do I call….

> HARTFORD: ….It's 1-888-485-7332.

(Def.'s Ex. 19, "Transcript of November 4, 2010 Call between Plaintiff and The Hartford at pgs. 4-5) (emphasis added).

[17] Specifically, Plaintiff was asked the following:

> HARTFORD: ….[D]o you have any time, um, that you've missed that you need to report on this call?

> CALLER: Um, not that I'm aware, no.

(Def.'s Ex. 19, "Transcript of November 4, 2010 Call between Plaintiff and The Hartford at pg. 4.) (emphasis added).

2010 absences backdated.  Further, by letter dated November 9, 2010, The Hartford informed

Plaintiff a second time that he had to call The Hartford to report any absences related to his

FMLA request or he could be denied FMLA coverage for late reporting.[18]  Plaintiff does not

deny receiving this letter (Szostek Dep. 164:4-6.) Accordingly, Plaintiff cannot now claim he did

not know he needed to report to The Hartford because this contention is clearly against the

record evidence.

> 2.  Interference

To prove an FMLA interference claim, an employee must show that he was entitled to

benefits under the FMLA and that his employer impermissibly denied him those benefits.

Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (internal citation

omitted).  Here, Plaintiff argues Drexel interfered with his FMLA rights by requiring him to

notify both Drexel and The Hartford when he needed to take FMLA leave.  According to

Plaintiff, this reporting requirement violates FMLA regulations." (Pl.'s Resp. Opp'n Mot. Summ.

J. 25) (citing 29 C.F.R. § 825.302).

The Court disagrees.  The record evidence demonstrates that, as of September 7, 2010,

Plaintiff had exhausted his FMLA leave entitlement.  Thus, for his absences on October 21, 25-

---

[18] Specifically, the letter stated:

> Thank you for your recent call providing notice of your future need for intermittent Family and Medical Leave (FML).  *At the time you need to take a leave of absence, please contact The Hartford to notify us of your actual last day worked.*"

> […]

> *Please remember that it is your obligation to contact [T]he Hartford to report each date and time that you are absent from work relating to your Intermittent FML….Failure to provide this information does not allow us to make a determination for Family and Medical Leave. As a result, you may lose the protection afforded by the Family and Medical Leave Act (FMLA) consistent with the Drexel University leave policy.*

(Def.'s Ex. 27, "The Hartford's November 9, 2010 Letter to Plaintiff") (emphasis added).

27, 29, 2010 and November 2, 3, 2010, Plaintiff was not entitled to benefits under the FMLA because he had not yet reapplied for FMLA through The Hartford and, once he did reapply, did not seek to have these absences backdated. There can be no interference where there are no benefits to interfere with.

With respect to his absences on November 10, 11, 23 and 24, 2010, Plaintiff would have been entitled to FMLA leave *if* he had timely reported to The Hartford. Plaintiff had every reason to know — from the October 28, 2010 Commercial Driver's meeting; from his November 4, 2010 meetings with Mr. Nayar, Mr. Flemming, and Mr. Maahs; from his November 4, 2010 phone call to The Hartford; and from The Hartford's November 9, 2010 letter to him — that he needed to report FMLA-related absences to The Hartford. Plaintiff was not entitled to benefits under the FMLA for these dates because he did not follow reporting procedure.[19]

---

[19] In addition, Plaintiff's claim that "Drexel also violated the FMLA regulations requiring it to resolve disputes regarding FMLA leave through discussion between the employee and employer" (See Pl.'s Resp. Opp'n Mot. Summ. J. 26) is both irrelevant and factually incorrect. The record demonstrates that Plaintiff exhausted his FMLA leave by September 7, 2010. Nonetheless, when Plaintiff's supervisors met with him on November 4, 2010, they encouraged him to reapply for FMLA leave through The Hartford if he still needed leave and to try to get his absences backdated. This demonstrates that Drexel made an effort to work with Plaintiff and to accommodate his need for leave. Further, Drexel did not even count Plaintiff's approximately eight unexcused absences between September 10, 2010 and October 21, 2010 as part of its progressive disciplinary process, even though it conceivably could have.

Likewise, the Court also finds unavailing Plaintiff's contention that "[w]hen [he] did not call The Hartford between November 4 and 30, 2010 to report FMLA leave, Defendant did nothing to inform [him] that his FMLA leave was in jeopardy and did nothing to inform him to correct it." (Id.) In reality, Plaintiff was *repeatedly* informed — at the Commercial Drivers meeting on October 28, 2010 and at both of Plaintiff's meetings with his supervisors on November 4, 2010 — that The Hartford had taken over administration of Drexel's FMLA program and that any requests for leave needed to be directed to The Hartford. In addition, during his November 4, 2010 phone call with The Hartford, Plaintiff was again told that he needed to report his FMLA absences *to The Hartford* and was advised that absences could be denied if they were not timely reported *to The Hartford*. (See Def.'s Ex. 19, "Transcript of November 4, 2010 call between Plaintiff and The Hartford at pg. 4-5.) Further, The Hartford's November 9, 2010 letter to Plaintiff again reminded him to contact The Hartford when he needed to take leave. And unlike all the other informational mailings sent to Plaintiff, which Plaintiff states he did not receive, Plaintiff cannot deny receiving the November 9, 2010 letter because he had Dr. Hart complete the medical certification form that was mailed along with the letter. (See Pl.'s Resp. Opp'n Mot. Summ. J. 8; Def.'s Ex. 27, "The Hartford's November 9, 2010 Letter to Plaintiff.") It is clear that Plaintiff was repeatedly informed on numerous occasions, by his supervisors and by The Hartford, as to the correct application and reporting procedure. It is difficult to understand how Plaintiff can now attempt to blame Drexel for his own unwillingness to follow the directions given to him.

Accordingly, the Court finds that Plaintiff has not shown there are any genuine issues of material fact with respect to his alleged FMLA interference claim.

**B. Discrimination and Retaliation in Violation of the ADA (Counts II and III) and the PHRA (Count IV)**

    1. <u>Discrimination</u>

Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, as the language of § 12111(8) suggests, in order for a plaintiff to maintain a *prima facie* case of disability discrimination under the ADA he must show that: (1) he is disabled; (2) he could perform the essential functions of his job with or without reasonable accommodations; and (3) he has suffered an adverse employment action as a result of discrimination based on his disability. <u>See</u> <u>Gaul v. Lucent Techs., Inc.</u>, 134 F.3d 576, 580 (3d Cir.1998). The burden-shifting framework of <u>McDonnell Douglas</u> also applies to ADA disparate treatment claims. <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000) (internal citations omitted). Before turning to the question of whether these elements have been satisfied, the Court first notes that its analysis and conclusions regarding Plaintiff's ADA discrimination claim applies equally to his PHRA discrimination claim. <u>See</u>, <u>e.g.</u>, <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999) (citing <u>Kelly v. Drexel University</u>, 94 F.3d 102, 105 (3d

Cir.1996)) (because the analysis for claims under the ADA is the same for claims under the PHRA, it is not necessary to perform a separate analysis).

With respect to the first element, Drexel does not dispute the Plaintiff was "disabled" within the meaning of the ADA.[20] Drexel does, however, contend that Plaintiff cannot satisfy the second element of a *prima facie* case because he was substantially limited in his ability to drive and perform *any* work. In support, Drexel cites Plaintiff's testimony in which he stated that he had no control over his "flare-ups" and no warning as to when a "flare-up" would occur. (Szostek Dep.181:17-21.) Plaintiff further testified that he could not perform any work when a "flare-up" occurred. (Szostek Dep. 178:3-8, 180:4-181:2). In particular, Plaintiff testified that he had approximately four or five incidents in which he would have to stop driving the student passenger bus because of a "flare-up." (Szostek 182:14-183:2.) Plaintiff testified that he would pull over when a "flare-up" came on because it was unsafe to drive during a "flare-up." (Szostek Dep. 23:17-22; 180:8-20; 182:14-183:2.) Thus, Drexel contends, Plaintiff was not a qualified individual with a disability under the ADA. Plaintiff responds by noting that nowhere in the record does anyone at Drexel suggest that Plaintiff was unable to perform the essential functions of his job, with or without an accommodation. Plaintiff also notes that the obvious accommodation for Plaintiff would be that, from time to time, he would take time off from work if his flare-ups were severe.

The Court finds that, at the very least, there are genuine issues of material fact as to whether Plaintiff could perform the essential functions of his job. On the one hand, Dr. Hart's Medical Certification and Plaintiff's own testimony that he was unable to drive (an essential

---

[20] Under the ADA, a plaintiff must demonstrate that he is disabled by showing (1) that he has a "physical or mental impairment which substantially limits one or more major life activities," (2) that he has "a record of such an impairment," or (3) that he "is regarded as having such an impairment." 42 U.S.C. § 12102(1).

function of his job) and perform any work during these repeated and unforeseeable "flare ups" presents the possibility that Plaintiff may not be a qualified individual with a disability under the ADA. On the other hand, no one at Drexel has testified that Plaintiff was unable to perform his job, even with his occasional "flare ups." Further, nothing in the record suggests that Plaintiff was unable to perform the essential functions of his job with the accommodation of being able to take intermittent time off from work.

However, the Court also finds that even if Plaintiff could establish the second element of a *prima facie* case, he could not satisfy the third element. As with Plaintiff's FMLA retaliation claim, Plaintiff's ADA discrimination claim fails on the issue of causation. Nothing in the record suggests Plaintiff was terminated *as a result* of his alleged disability. Gaul, 134 F.3d at 580. Although Plaintiff alleges that Mr. Nayar, Ms. Jones, and Mr. Maahs knew of his alleged disability, Plaintiff fails to present any evidence that this factored into Drexel's decision to terminate his employment. Moreover, Plaintiff admitted that no one at Drexel made discriminatory remarks to him. (Szostek Dep. 213:2-5.) Further, for the reasons already discussed with respect to Plaintiff's FMLA retaliation claim, Plaintiff cannot established that Drexel's proffered reasons for his termination is a pretext for disability discrimination.

### 2. Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Krouse, 126 F.3d at 500. Because the anti-retaliation provisions of the ADA and PHRA are substantially similar, the analytical framework is identical. See, e.g., Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir.2002). Once again, the burden-shifting framework of McDonnell Douglas also applies to ADA retaliation claims. Shaner, 204 F.3d at 500.

The Court finds Plaintiff has not satisfied any of the aforementioned elements.  None of Plaintiff's briefs specify what "protected activity" he allegedly engaged in.  The record evidence, however, demonstrates that Plaintiff cannot establish he engaged in a protected activity. Significantly, Plaintiff testified that he never complained of disability discrimination nor did he request an accommodation during his employment with Drexel. (Szostek Dep. 193:15-17, 196:13-17.) Because Plaintiff did not engage in protected activity, his claim for disability retaliation fails as a matter of law.  Moreover, even if Plaintiff could establish that he engaged in a protected activity, he again would be unable to establish a causal connection between protected activity and his discharge. Further, Plaintiff has no evidence to dispute Defendant's valid, non-retaliatory reasons for his discharge and can offer no evidence that Defendant's proffered reasons are pretextual and the real reason for his discharge was retaliation.

### C. Workers' Compensation Retaliation (Counts III)

Finally, Plaintiff alleges that he was impermissibly retaliated against by Drexel for workers compensation leave.  "Under Pennsylvania law, an at-will employee may not be discharged in retaliation for filing a workers' compensation claim." Deily v. Waste Mgmt. of Allentown, 55 F. App'x 605, 608 (3d Cir. 2003) (citing Shick v. Shirley Lumber, 552 Pa. 590, 716 A.2d 1231, 1236-1237 (Pa.1998)).  Because the Pennsylvania Supreme Court has not yet set forth the elements of a *prima facie* case of retaliatory discharge, courts apply the analysis followed in claims of retaliatory discharge under Title VII of the Civil Rights Act of 1964. Id.; see also Landmesser v. United Air Lines, Inc., 102 F.Supp.2d 273, 277-78 (E.D.Pa.2000); Alderfer v. Nibco Inc., CIV. A. 98-6654, 1999 WL 956375 (E.D. Pa. Oct. 19, 1999).

In order to advance a *prima facie* case of retaliation in the Title VII context, a plaintiff must show that: (1) he engaged in a protected employee activity; (2) he suffered an adverse

employment action; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.2000) (citations omitted). If the employee establishes this *prima facie* case of retaliation, the familiar McDonnell Douglas approach applies. Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir.1997)).

Applying this analysis to the instant case, it is clear that the first two elements of a *prima facie* case have been met: Plaintiff engaged in a protected activity as defined under Shick, and Drexel took the adverse action of terminating him after him had engaged in that protected activity. But as with Plaintiff's claim of FMLA retaliation and ADA discrimination claims, the Court finds that Plaintiff cannot satisfy the third element of a *prima facie* case.

As previously stated, Plaintiff began workers' compensation leave on July 15, 2010 and returned from this leave on August 26, 2010. Approximately six months later, on January 5, 2011, Drexel terminated Plaintiff's employment. Six months between Plaintiff's workers' compensation leave and his termination is not "unduly suggestive" of causation. Farrell, 206 F.3d at 280. The Court recognizes that evidence that is considered probative of the causal link between protected activity and an adverse employment action "is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can [also] be other evidence gleaned from the record as a whole from which causation can be inferred." Farrell, 206 F.3d at 281. Here however, in support of his workers' compensation retaliation claim, Plaintiff states nothing more than the following: "[g]iven the harsh and unfair manner [in which] Defendant treated Mr. Szostek after he returned from workers' compensation leave, a jury could easily infer that Defendant was retaliating against him for having filed a workers' compensation claim." (Pl.'s Resp. Opp'n Mot. Summ. J. 29.) The Court finds this argument to be conclusory.

Plaintiff has proffered no evidence suggesting that a causal connection exists between his taking workers' compensation leave and Drexel's decision to terminate him. Indeed, nothing in the record suggests that anyone at Drexel expressed concern over Plaintiff taking workers' compensation leave. In addition, nothing in the record suggests anyone at Drexel displayed antagonistic conduct or animus toward Plaintiff for taking workers' compensation leave. If anything, the record reveals that Plaintiff was terminated due to various issues surrounding his taking FMLA leave in October and November 2010, not his workers' compensation leave (which had long since ended in August 2010).

Moreover, as previously discuss with respect to Plaintiff's FMLA retaliation claim, Plaintiff has no evidence to dispute Defendant's valid, nonretaliatory reasons for his discharge and can offer no evidence that Defendant's proffered reason was a pretext and that the real reason for his discharge was retaliation. Therefore, Plaintiff's workers' compensation retaliation claim also fails.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants summary judgment in favor of Drexel University on all of Plaintiff's claims. An appropriate order follows.